**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| THELMA I. McGRAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3165 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Thelma I. McGraw appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). McGraw filed a Motion for Summary Judgment titled Brief in Support of Motion for Summary Judgment (d/e 14). The Defendant Commissioner filed a Motion for Summary Judgment entitled Motion for Summary Affirmance (d/e 15). McGraw filed a Reply (d/e 17) to Defendant's Motion for Summary Judgment. The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered January 2, 2018 (d/e 13). For the reasons set

forth below, the Commissioner's Motion for Summary Judgment is ALLOWED, McGraw's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

## STATEMENT OF FACTS

McGraw was born on September 3, 1951. She secured a GED and took some college courses. She previously worked as a coordinator/receptionist—secretary. She alleged that she became disabled on June 1, 2012 (Onset Date). She qualified for Disability Benefits through December 31, 2015 (Date Last Insured). McGraw suffers from status post breast cancer surgery and treatment, status post shoulder surgery and hip surgery, left knee arthritis, diabetes, obesity, asthma, gastroesophageal reflux disease (GERD), and vision impairments. Certified Copy of Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), at 22, 24-25, 59, 61-62, 227.

In 2002, McGraw underwent right hip replacement surgery. R. 72. She also underwent shoulder replacement surgery on each shoulder, one in 2004 and the other in 2007. R. 71; see e.g., R. 490. She continued working until April 2010. She retired at that time to take care of her husband. She has not worked thereafter. R. 80, 227, 234.

On March 13, 2011, McGraw underwent a chest x-ray due to a cough and congestion. The x-ray showed some scarring in the left mid lung, but no acute pulmonary abnormalities, and no other abnormalities. R. 354.

On January 24, 2012, McGraw saw Dr. Venu Reddy, M.D., for a follow-up examination after a pulmonary function test (PFT), methacholine challenge, sleep study, and chest x-ray. R. 577-79. McGraw reported that she was not able to sleep well. She reported severe insomnia. The PFT and methacholine challenge were normal. The sleep study showed no evidence of obstructive sleep apnea. On examination, McGraw's lungs were clear bilaterally to auscultation. Dr. Reddy assessed cough with unclear etiology, no evidence of sleep apnea, and moderate to morbid obesity. R. 578.

On June 20, 2012, McGraw underwent a mammogram, which identified lumps in her right breast. Subsequent biopsies established that she had breast cancer. Later in June 2012, McGraw underwent a lumpectomy, and then a right modified radical mastectomy and a prophylactic left mastectomy. R. 472.

On August 31, 2012, McGraw saw Dr. Mark Khil, M.D., for evaluation and consideration for radiation therapy. R. 473. McGraw reported that she had no headaches, dizziness, blurry vision, or episodes of seizures or

strokes. She reported a history of insomnia. On examination, McGraw was 5 feet 3 ½ inches tall and weighed 288 pounds. Dr. Khil recommended chemotherapy followed by radiation. McGraw had already seen Dr. Christian El-Khoury, M.D., to schedule the chemotherapy. McGraw agreed to Dr. Khil's planned radiation therapy. R. 475.

On November 20 2012, McGraw saw nurse practitioner Lisa Kauffman, CNP, for a follow-up visit during chemotherapy. McGraw was receiving six cycles chemotherapy treatment every 21 days. McGraw reported that she was feeling better, but had moderate fatigue. Her chest x-ray taken November 14, 2012, was clear. McGraw reported numbness in her toes. On examination, her lungs were clear to auscultation. Her blood sugar was 178. Kauffman assessed breast carcinoma and fatigue. R. 387-88.

On December 5, 2012, McGraw saw Dr. El-Khoury for a follow-up during her chemotherapy treatments. McGraw's toes hurt "without much neuropathy." The toes were slightly red and swollen. On examination, McGraw's lungs were clear. Dr. El-Khoury noted that McGraw would receive her last chemotherapy treatment on December 20, 2012. R. 391.

On January 30, 2013, McGraw saw Dr. Raymond P. Smith, M.D. Dr. Smith stated that McGraw received her last chemotherapy treatment on

January 9, 2013.  On examination, McGraw's lungs were clear with no rales, rhonchi, or wheezes.  Her blood sugar was 168.  McGraw reported that she had her best night's sleep in months.  Dr. Smith stated that she would continue the recovery from chemotherapy phase of her treatment. R. 402.

On March 12, 2013, McGraw saw Dr. El Khoury for a follow-up. McGraw was undergoing physical therapy for lymphedema.  McGraw reported not having much pain.  She reported some pain in the left popliteal area.[1]  She also had grade I neuropathy, which was improving.  Her fatigue was also better.  R. 408.  Dr. El Khoury planned a "Doppler" to see if she had a popliteal cyst.  R. 409.

Radiation therapy followed the chemotherapy.  On April 3, 2013, McGraw completed the radiation therapy.  R. 477.

On April 29, 2013, McGraw saw Dr. Christopher Wagoner for a three-month diabetes check. R. 523-26.  McGraw's A1c was "fantastic at 6.0."[2] McGraw denied having blurry vision.  R. 523.  On examination, McGraw had normal breath sounds.  She had a normal gait, no joint swelling,

---

[1] The popliteal area is the posterior part of the knee.  Dorland's Illustrated Medical Dictionary (32d ed. 2013) (Dorland's), at 1496.

[2]  The hemoglobin A1c test determines the percentage of red blood cells that are glycated, or covered with sugar.  The test reflects that average blood sugar level for the preceding two or three months. "A1c test" available at www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643, viewed March 20, 2018.

normal movement in all extremities, no joint instability, and normal muscle strength and tone.  McGraw's feet were swollen.  Her toes appeared normal.  R. 526.  Dr. Wagoner noted that McGraw's asthma was controlled. He adjusted her insulin dosage.  R. 526.

On May 2, 2013, McGraw saw Dr. Khil for a post-radiation treatment follow-up.  McGraw was stable and otherwise unremarkable.  Dr. Khil scheduled McGraw for a follow-up appointment in six months. R. 480.

On or about May 8, 2013, McGraw completed a Function Report— Adult form.  R. 264-71.[3]  She reported that she lived in a house with family. She said she required "lots of rest."  R. 264.  She said that in a usual day, she showered and dressed, prepared meals for herself and her husband, did simple housework and laundry, drove to laundromat, grocery, and "many" doctors' appointments for herself and her husband.  R. 265.  She said she could not do "heavy housework, yard work, drive as much as needed. Carry things heavy."  She said she had problems sleeping. R. 265.

McGraw said she prepared simple meals because she could not stand for long periods.  She said she washed dishes and performed "simple cleaning," laundry, and cooking.  She said her sons and brothers did the "heavy work," yardwork, and carrying for her.  R. 266.  She said she could

---

[3] McGraw did not date the form.  The date on the transmittal letter is May 8, 2013.

not do yardwork because she felt weak, she tired easily, and she often did not feel well. R. 267. She went grocery shopping three times a week so she could buy a "little bit at a time" because she could not carry much. R. 267. She rode scooters while in grocery stores. R. 270. She was able to pay her bills, handle her own funds. R. 267.

She said her hobby was researching genealogies. She used a computer to conduct this research. She did not use the computer more than three times a week because she tired easily. She talked to friends and relatives on the phone and went to church regularly. R. 268-69.

McGraw opined that she could not lift more than 10 pounds; she could walk 50 feet before she needed to rest 10 to 30 minutes; she could pay attention one to three hours; she finished what she started unless she was tired; she could follow instructions and get along with authority figures; and she could handle stress and changes in routine. R. 269-70.

On August 26, 2013, McGraw saw Dr. Christopher Wagoner, M.D., for a diabetes check. R. 501-05. Her blood sugar logs ranged from 141 to 377 with an average reading of 233. McGraw reported that she was fatigued; but she had no shortness of breath, no wheezing, and no cough. She reported joint pain and muscle aches; but no joint swelling, stiffness, muscle weakness, or loss of strength. She had no headaches, no

numbness, no tingling. R. 501. On examination, she had clear breath sounds bilaterally, a normal gait, normal movement of all extremities, no joint swelling, no joint instability, and normal muscle strength and tone. Dr. Wagoner assessed stress and prescribed amitriptyline to reduce stress and help McGraw sleep. R. 505.

The same day August 26, 2013, McGraw saw state agency physician Dr. Joseph Kozma, M.D., for a consultative examination. R. 482-87. McGraw reported that she last worked in April of 2009. She reported that she had diabetes and her last A1c was 7.2. She reported she had diarrhea after every meal. She said she was not able to walk a block. She said she was unstable when she walked. She did not use a cane or crutches. R. 482. She reported that she had migraines occasionally. She said her diabetes was poorly controlled. She said she had diabetic neuropathy in her legs. R. 483.

On examination by Dr. Kozma, McGraw was 63 inches tall and weighed 272 pounds. McGraw's visual acuity was 20/20 with correction. McGraw's lungs were clear to percussion and auscultation. McGraw had normal strength in her extremities. McGraw had decreased range of motion in her shoulders. She had normal grip strength and normal finger dexterity. Sensory examination and reflexes were normal. R. 484-85.

McGraw could heel walk and toe walk.  She could squat ¾ of the way.  Straight leg raising was 50 degrees bilaterally.  She had a normal gait.  Dr. Kozma observed no instability in her walking.  McGraw could use her hands for both fine and gross manipulations. R. 485-86.

Dr. Kozma stated that McGraw "has a rather strong emotional attachment to her various symptoms.  She is rather convinced that they are quite incapacitating."  R. 486.  Her medical records indicated that her hypertension and diabetes were not well controlled.  R. 486.

On August 28, 2013, state agency physician Dr. B. Rock Oh, M.D., prepared a Physical Residual Functional Capacity Assessment of McGraw. Dr. Oh opined that McGraw could occasionally lift 20 pounds and frequently lift 10 pounds; could stand and/or walk six hours in an eight-hour workday; could sit six hours in an eight-hour workday; could frequently climb stairs and ramps; could occasionally climb ladders, ropes, and scaffolds; and was limited in reaching overhead with her right arm.  Dr. Oh opined that McGraw had no other functional limitations due to her impairments.  R. 93-95

On September 9, 2013, McGraw saw Dr. Wagoner for a two-week checkup after starting protonix for GERD.  R. 489-93 On examination, McGraw's lungs had clear bilateral breath sounds and no cough.  McGraw

had a normal gait, no joint swelling, normal movement of all extremities, no joint instability, muscle strength and tone were normal. R. 492. Dr. Wagoner assessed essential hypertension, depression, GERD, and insomnia. R. 493.

On February 18, 2014, McGraw completed another Function Report—Adult form. R. 287-95. She reported that she lived alone in her house. She said that she could not sleep for up to five days at a time. She did not sleep well even when she went to sleep. She said she had no stamina. She said she carried groceries "in stages" or she used a children's toy wagon to carry them. She said she did not have much strength. R. 287.

She said that she shopped only for necessities. She also went to the laundromat and visited her husband at the nursing home where he resided. He husband had dementia. She said she could not drive for more than 45 minutes. She said her insomnia has gotten worse since the last report. R. 288.

McGraw reported that she prepared her own meals. She prepared "quick simple things" because she could not stand for long periods. She no longer prepared big family meals. She did laundry, dishes, and light vacuuming with breaks. R. 289. She did no yardwork. R. 290. She drove

to the nursing home daily to see her husband.  She shopped only when necessary.  She could pay her bills and manage her funds.  R. 290.

McGraw described her hobbies as "Reading, genealogies, TV, grandkids."  She sat in a wheelchair when she went anywhere with her grandchildren.  She visited with others during the day, which included eating with them and going to movies with them.  She went regularly to church, the nursing home, and the pharmacy.  R. 291.

McGraw opined that the farthest distance she could walk was "to the car."  She then had to rest 10 to 15 minutes.  She had no problems paying attention.  She finished what she started "unless I fall asleep."  She could follow instructions and get along with authority figures.  She tried to handle stress, but "when it is too much I cry."  She could handle changes in routine.  R. 292-93.

On February 24, 2014, McGraw's aunt Marva Hurst completed a Function Report—Adult—Third Party form.  R. 299-306.  Hurst said that she spent two to five hours with McGraw daily.  Hurst said they ate together, watched television, and went shopping.  She said McGraw could not stand or walk very long before her knee gave out.  She said McGraw could not carry much and had a difficult time catching her breath.  Hurst

said McGraw spent her days going to the doctor, the pharmacy, the laundromat, the nursing home, and visiting her.  R. 299.

Hurst said McGraw had trouble sleeping.  Hurst said McGraw had difficulty bending to dress and wash herself.  R. 300.  Hurst said that McGraw prepared her own meals, but did not take much time doing so.  Hurst said McGraw did her own laundry and "basic housework."  Hurst said McGraw needed help carrying laundry to and from the laundromat.  R. 301.  She said McGraw's sons did the yardwork.  She said McGraw used a motorized grocery cart to shop for groceries.  She said McGraw could pay her bills and manager her funds.  R. 302.

Hurst said that McGraw visited her husband daily.  She said McGraw also visited friends and family, including Hurst.  McGraw also went to church.  McGraw had someone accompany her when she drove out of town.  R. 303.

Hurst opined that McGraw could lift a maximum of 10 pounds; McGraw could not squat or bend; could not stand for long; and could walk 50 feet before needing to rest for 10-15 minutes.  Hurst said McGraw could pay attention, follow instructions, get along with authority figures, handle stress, and handle changes in circumstances.  R. 304-05.

On March 26, 2014, state agency physician Dr. Michael Nenaber, M.D., prepared a Physical Residual Functional Capacity Assessment of McGraw. R. 103-05. Dr. Nenaber's assessment was identical to Dr. Oh's assessment in August 2013.

On September 19, 2014, McGraw saw ophthalmologist Dr. Robert Weller, M.D., for a diabetic eye examination. R. 703-05. McGraw's visual acuity was 20/30+2 in the right and 20/20 in the left. R. 703. Dr. Weller diagnosed senile cataracts in both eyes and non-exudative senile macular degeneration of the retina in the right eye. R. 703.[4]

On November 7, 2014, McGraw saw Dr. Wagoner for a three-month diabetes check. R. 758-63. McGraw's A1c was 6.0, no change from previous check. McGraw reported headaches in the evenings sometimes. The headaches resolved "quickly/spontaneously." R. 758. On examination, McGraw had clear bilateral breath sounds, normal gait, no joint swelling or joint instability, normal movement of all extremities, normal muscle strength and tone, and full range of motion in the extremities. R. 762. Dr. Wagoner adjusted McGraw's diabetes medication. R. 762.

---

[4] Non-exudative senile macular degeneration is age-related degeneration of the spot in the center of the retina called the macula, also known as dry macular degeneration. Macular degeneration reduces the person's ability to see directly in front of the person. See National Eye Institute, "Facts About Age-Related Macular Degeneration," located at https://nei.nih.gov/health/maculardegen/armd_facts, viewed March 20, 2018.

On February 9, 2015, McGraw saw Dr. Wagoner for a three-month diabetes check. R. 850-54. McGraw reported her blood sugar was running 120-130, and she was having headaches and fatigue. R. 850. On examination, McGraw had normal breath sounds bilaterally, normal gait, no joint swelling, normal movement in all extremities, no joint instability, normal muscle strength and tone, and full range of motion in her extremities. McGraw's feet and toes were not swollen. McGraw had normal tactile sensation with monofilament testing, normal position sense, and normal vibratory sensation bilaterally. R. 853-54. Dr. Wagoner assessed diabetes mellitus type II, controlled. R. 854.

On April 15, 2015, McGraw saw ophthalmologist and retina specialist Dr. Kevin Blinder, M.D. McGraw's vision was 20/50-2 in the right eye and 20/20 in the left. McGraw had cataracts in both eyes and sub-retinal fluid in the right eye. Her retinas were attached in both eyes. She had no leakage of fluid out of either eye. Dr. Blinder assessed cataracts in both eyes, right worse than left; and possible central serous chorioretinopathy.[5] Dr. Blinder recommended removing the right cataract. R. 901.

---

[5] Central serous chorioretinopathy is a build-up of fluid between the retina and the layer of tissue under the retina called the choroid. American Association of Ophthalmology, author Daniel Porter, "What is Central Serous Chorioretinopathy?," located at www.aao.org/eye-health/diseases/what-is-central-serous-retinopathy, viewed March 20, 2018.

On April 28, 2015, McGraw saw ophthalmologist Dr. Robert Weller, M.D., for a pre-operative visit.  R. 875.  On May 12, 2015, Dr. Weller performed the surgical removal of McGraw's cataract in her right eye.  R. 996.

On June 3, 2015, McGraw saw Dr. Blinder.  McGraw's visual acuity was 20/50-1 in the right eye and 20/40 in the left.  Dr. Blinder found sub-retinal fluid in the right eye, but none in the left.  Dr. Blinder's impression was possibly central serous chorioretinopathy and pseudophakia in the right eye and cataract in the left.[6]  Dr. Blinder treated her right eye with an injection.  R. 909.  The injection consent form stated that the diagnosis was age-related macular degeneration.  R. 911.

On July 22, 2015, McGraw saw Dr. Blinder.  McGraw's visual acuity was 20/50 in the right eye and 20/40-2 in the left.  Dr. Blinder's examination showed pseudophakia in the right eye and a cataract in the left. Dr. Blinder's impression was probable occult choroidal neovascularization of the right eye versus central serous chorioretinopathy.[7]  On July 22, 2018, Dr. Blinder again treated her right eye with an injection.  R. 919.

---

[6] Pseudophakia is the artificial lens implanted after cataract surgery. National Eye Institute, "Cataract | Pseudophakia," located at https://nei.nih.gov/faqs/cataract-pseudophakia, viewed March 20, 2018.

[7] Choroidal neovascularization is the abnormal growth of new blood vessels in the choroid layer of the eye under the retina, also known as wet macular degeneration.  American Macular Degeneration Foundation, "Wet Macular Degeneration," located at https://www.macular.org/wet-amd, viewed March 20, 2018.

On July 31, 2015, McGraw saw podiatrist Dr. Duane Hanzel, D.P.M., for thickened and discolored toenails, and a routine clinic follow-up of diabetic feet. R. 836-40. On examination, McGraw had abnormal dorsalis pendis pulse and abnormal capillary refill.[8] She had normal response to light touch and normal response to monofilament testing. R. 839. Dr. Hanzel assessed peripheral neuropathy and debrided her toenails. R. 839-40.

On September 3, 2015, McGraw saw Dr. Blinder. McGraw's visual acuity was 20/50+ in the right eye and 20/30 in the left. Examination showed pseudophakia in the right eye and cataract in the left. Dr. Blinder's impression was central serous chorioretinopathy in the right eye, possibly choroidal neovascularization; pseudophakia in the right eye; and cataract in the left. McGraw agreed to undergo a laser treatment in her right eye in the near future. R. 924.

On September 29, 2015, McGraw saw Br. Blinder. McGraw reported that her vision was out of focus in both eyes at night. R. 929. McGraw's visual acuity was 20/60-2 in the right eye and 20/40+2 in the left. R. 934.

---

[8] The dorsalis pendis pulse is the pulse on the top of the foot between the first and second metatarsal bones. Dorland's, at 1554. Capillary refill refers to applying blanching pressure to the toes and measuring the time it takes for them to regain color. Abnormally long capillary refill time (greater than 3 seconds) indicates poor blood flow. University Foot & Ankle Institute, "Diabetic Food Exam: What to Expect," located at https://www.footankleinstitute.com/diabetic-foot-exam-what-to-expect, viewed March 20, 2018.

McGraw had a laser treatment called photodynamic therapy in the right eye to treat her central serous chorioretinopathy.[9]  R. 928.

On October 9, 2015, McGraw saw Dr. Hanzel for a routine follow up on her diabetic feet and toenail disease.  R. 820-24.  On examination, McGraw had abnormal dorsalis pedis pulse and abnormal papillary refill. McGraw had normal response to light touch and normal response to monofilament testing.  R. 823. Dr. Hanzel assessed peripheral neuropathy and debrided her toenails.  R. 823-24.

On November 6, 2015, McGraw saw Dr. Blinder.  McGraw reported blurred vision, flashes, and light sensitivity in the right eye since October 23, 2015.  McGraw's visual acuity was 20/200 in the right corrected by pinhole to 20/60-2; her acuity was 20/20-1 in the left.  R. 935.  Dr. Blinder's impression was cataract in the left eye; and in the right eye a round hole in the macula portion of her retina, a retinal hemorrhage, central serous choriorentopathy, a vitreous hemorrhage, posterior vitreous detachment (PVD), and pseudophakia.[10]  McGraw underwent a laser panretinal

---

[9] Photodynamic therapy involves injection of a light sensitive medicine into the arm.  The medicine collects in abnormal blood vessels behind the retina.  A laser is directed into the eye.  The medicine reacts and creates clots in the abnormal vessels to prevent more vision loss.  Johns Hopkins Medicine Health Library, "What is Photodynamic Therapy for Age-Related Macular Degeneration," located at www.hopkinsmedicine.org/healthlibrary/test_procedures/other/photodynamic_therapy_for_age-related_macular_degeneration_135,362, viewed March 20, 2018.
[10] Posterior vitreous detachment occurs when the vitreous substance in the eye detaches from the retina. American Academy of Ophthalmology, author Daniel Porter, "What is Posterior Vitreous Detachment," located at www.aao.org/eye-health/diseases/what-is-posterior-vitreous-detachment, viewed March 20, 2018.

photocoagulation treatment to her right retina to treat the hole in the macula.[11]  R. 936.

On December 9, 2015, McGraw saw Dr. Blinder.  McGraw reported that she no longer saw flashes and floaters in her right eye, but still had constant blurry vision.  On examination, McGraw had good laser scars around the hole in her macula.  McGraw's visual acuity was 20/60 in the right eye and 20/25 in the left.  Dr. Blinder told her she was doing well at this point and would see her in two months.  R. 946.

On December 10, 2015, McGraw saw otolaryngologist Dr. Douglas Phan, M.D., for a follow-up appointment for chronic mastoiditis.  R. 1062-66.  Dr. Phan noted that McGraw had the following active problems:

**Active Problems**
- Altered mental status
- Arthritis of left knee
- Asthma
- Balance problems
- Chronic daily headache
- Chronic mastoiditis
- Decreased level of consciousness
- Depression
- Diabetes mellitus type II, controlled
- Essential (primary) hypertension
- Gastroesophageal reflux disease
- Hyperlipidemia
- Ingrown toenail
- Insomnia

---

[11] Dr. Bowen testified that photocoagulation treatment was a treatment in which Dr. Blinder used laser to close the hole in McGraw's macula portion of her retina.  R. 45.

- Left knee pain
- Locking of left knee
- Onychauxis
- Onychomycosis
- Otitis externa
- Peripheral neuropathy
- Polyp, nasal sinus
- Sensorineural hearing loss of both ears
- Sinusitis, chronic
- Sleep-wake cycle disorder

R. 1062 (emphasis in the original, diagnostic codes omitted). On examination, Dr. Phan assessed mucocele of maxillary sinus. Dr. Phan scheduled a CT scan without contrast of McGraw's sinuses to document or rule out the recurrence of the mucocele. R. 1065-66.[12]

On December 21, 2015, McGraw underwent a CT scan of her sinuses. R. 1027-28. The CT scan showed normal sinuses with nasal mucosal thickening. R. R. 1028.

On January 5, 2016, McGraw saw nurse practitioner Charlene Young, FNP-C, complaining of problems sleeping and tiredness. R. 1007-10. On examination, McGraw had intact visual fields and visual acuity. McGraw walked with a limp and used a cane. She had normal strength, intact muscle tone, and no muscle atrophy. R. 1009-10. Young scheduled a sleep study. R. 1010.

---

[12] A mucocele is a dilatation of a cavity with accumulation of mucous secretion. Dorland's, at 1185.

On January 15, 2016, McGraw saw Dr. Hanzel for a routine follow-up on toenail disease. R. 1056-60. On examination, McGraw had abnormal dorsalis pedis pulse and abnormal capillary refill. McGraw had normal response to light touch and normal response to monofilament testing. Dr. Hanzel assessed peripheral neuropathy and ingrown toenail. R. 1059. Dr. Hanzel debrided McGraw's toenails. R. 1060.

On January 20, 2016, McGraw saw Dr. Wagoner for a three-month diabetes check. R. 1049-54. McGraw reported swelling in her feet, ankles, lower legs, and hands. McGraw said her left knee was "painful and collapsing a lot." R. 1049. On examination, McGraw had clear breath sounds bilaterally, normal gait, no joint swelling, normal movement of all extremities, no joint instability, normal muscle strength and tone, and full range of motion in her extremities. Dr. Wagoner assessed that McGraw's diabetes was controlled. Dr. Wagoner changed McGraw's asthma medicine from daily Advair to Proair on an as needed basis. Dr. Wagoner noted that McGraw, "apparently doesn't even have evidence in the past of asthma nor COPD anyway." Dr. Wagoner noted that McGraw used a cane and needed assistance with mobility. R. 1053-54.

On January 25, 2016, McGraw saw Dr. Phan for a follow up after the CT scan of her sinuses. R. 1043-47. Dr. Phan noted that the CT scan

showed that the mucocele has resolved.  Dr. Phan assessed mucocele of the maxillary sinuses resolved on follow up sinus CT.  R. 1047.

On February 4, 2016, McGraw underwent a CT scan of her chest. The scan showed nodules in her right lung, atelectasis at the lingula and lung bases, and indications of air trapping.  R. 1035.[13]

On February 19, 2016, McGraw saw Dr. Blinder.  McGraw's visual acuity was 20/80+1 in the right eye and 20/25 in the left.  R. 1093.  The condition of McGraw's eyes had not changed since the last time Dr. Blinder examined her.  Dr. Blinder performed a photodynamic therapy treatment on her right eye.  R. 1094.

On March 21, 2016, McGraw saw Dr. Wagoner for a diabetes check. R. 1098-1104.  McGraw's A1c "skyrocketed from 6.6 to 13.3. Hasn't been above 6.7 in over two years."  R. 1098.  Dr. Wagoner said a recent sleep study showed moderate to severe obstructive sleep apnea.  She was waiting for a CPAP machine to use at night.  Dr. Wagoner said she saw a pulmonologist for pulmonary nodules.  A PFT was scheduled for April 18, 2016.  R. 1098.  McGraw was 5 feet 3 inches tall and weighed 265 pounds. On examination, McGraw's lungs were clear to auscultation.  McGraw had

---

[13] Atelectasis is incomplete expansion of the lungs.  Dorland's, at 171.  Lingula of the lung is a projection from the lower portion of the upper lobe of the left lung.  Dorland's, at 1060.

normal range of motion, no joint swelling, normal muscle strength and tone. Her gait was antalgic on the left. Dr. Wagoner told McGraw to continue checking her blood sugar and return in three months. R. 1104.

## THE EVIDENTIARY HEARINGS

### The January 7, 2016 Hearing

On January 7, 2016, the Administrative Law Judge (ALJ) conducted an evidentiary hearing. R. 55-88. McGraw appeared in person and with her counsel. Vocational expert Alissa Smith also appeared. R. 57; see R. 327-28 (resume of Alissa Smith).

McGraw testified first. She said she was married. Her husband was in a nursing home.[14] She said she was 5 feet 3 ½ inches tall and weighed 273 pounds. McGraw lived in a house with a wheel chair ramp accessing the entrance. R. 60-61.

McGraw used a cane at the hearing. She began using the cane a month before the hearing. She indicated she had a torn meniscus in her left knee. Her sons asked her to use the cane for stability when walking. She made her doctor aware of the cane. R. 61-62.

McGraw had completed some college. McGraw said she last worked as a coordinator/receptionist—secretary at the Illinois Department of

---

[14] The medical records contain a notation that her husband died in February 2016. R. 1096.

Human Services.  The job ended in 2010.  She said she was on her feet two hours a day.  The heaviest weight she lifted was 15-20 pounds.  R. 62.  She stopped working when she retired from her job to take care of her husband.  R. 80.

McGraw testified she became disabled in June 2012 when she began her treatments for breast cancer.  R. 60.  She related that the breast cancer treatments lasted five months.  She said that as a result of the chemotherapy she developed neuropathy in her feet.  She indicated, as a result of the neuropathy, "In some instances I don't feel things, and other instances It's like a burning sensation . . . ."  R. 63.  She said she experienced these symptoms daily to some degree.  She testified she has fallen five or six times in the "last couple of years."  She indicated she has also lost her balance but caught herself before she fell.  R. 63-64.

McGraw testified that she was diagnosed with diabetes in 2003.  She began taking diabetes medication at that time.  She was on insulin for three years.  She went off insulin in approximately 2007.  She went back on insulin in June 2012 when the cancer treatments started.  She stayed on insulin until 2015.  Her doctor checked her A1c every three months.  R. 64.

McGraw testified that her neuropathy affected her hands.  She indicated that her right middle finger locked up sometimes.  The finger

became painful.  Her right hand was her dominant hand.  She also testified that she has lost the grip strength to open jars.  She said her hands hurt after she did "a lot of keyboarding."  She said she used a keyboard for 30 minutes a day now.  She said her hands hurt severely after 30 minutes of using a keyboard.  She said she used to use a keyboard for three to four hours a day working on genealogies.  She also testified that her toes were starting to lock up on her.  R. 64-66.

McGraw testified that the chemotherapy treatments made her insomnia worse.  She said she would lie awake all night about six nights a week.  She would finally fall asleep between 4:00 a.m. and 6:00 a.m.  She would usually sleep until 11:00 a.m. She was regularly exhausted during the day as a result her poor sleep.  R. 67-68.  She said the amitriptyline initially helped her sleep, but the insomnia returned in a short time after her body became used to the medicine.  R. 67.

McGraw testified that she has had diarrhea on a daily basis since she started the chemotherapy treatments.  She indicated that she was dehydrated as a result.  She also testified that she always had an irritable bowel.  She testified that she treated her diarrhea herself with "fiber therapy and stuff."  R. 69.

She testified that her vision became worse after the chemotherapy. She indicated she had cataracts and fluid behind the retina in her right eye. She said she had injections and laser treatments in her right eye.  R. 70. She said she had problems reading.  She could read for about 30 minutes. After that, she said, "I can't see the print with that eye."  R. 71.

McGraw testified that she had shoulder replacement surgery on both shoulders.  The first was in 2004 and the second was in 2007.  R. 71.  She said she experienced pain moving her arms up high.  She said she could not handle anything when her right hand was up high.  She said she experienced pain daily in her right shoulder.  She took hydrocodone as needed for the pain.  She said she took hydrocodone only when the pain was very severe. R. 71-72.  McGraw said she had right hip replacement surgery in 2002.  R. 72.  She said that she did not file for disability because of these surgeries.  She only filed after she started her chemotherapy in 2012.  R. 80.

McGraw said the pain in her shoulders and hip have increased since she stopped working in 2010.  She opined that she could sit in a chair for an hour at a time.  She said she could carry packages or bags from her car to her house, but then had to sit down for 30 minutes to rest.  R. 72-73.

McGraw testified that she has had migraine headaches for years. She said she had migraine headaches about once every two or three months.  Each headache usually lasted a couple of days.  She took Tylenol or ibuprofen and "put up with it for a couple of days, if it's just a regular headache."  R. 73.  She said she had sinus infections about every other month and her sinuses hurt all the time.  She used nasal sprays and allergy medication to treat her sinuses.  R. 74.

McGraw said that on a usual day she spent time on the computer. She also drove to her own doctors' appointments and took her granddaughter to her doctors' appointments.  McGraw also saw her husband every day in the nursing home.  R. 75.  She stayed at the nursing home an hour to an hour and a half each day.  She could sit comfortably for an hour to an hour and a half.  R. 75.  She also read and watched television.  She said that she used to sew, but she could not thread a needle now.  R. 78.

McGraw testified that she experienced fatigue since her chemotherapy treatments.  She said that she had problems concentrating. She took longer to work crossword puzzles and other puzzles than previously.  She has had trouble remembering the correct spelling of words

and remembering telephone numbers.  She said that she was on antidepressants after she had breast cancer treatments.  R. 75-76.

McGraw testified that she lived by herself prior to the fall of 2015.  She said that in the fall of 2015, she started living with her son because she could not afford winter utilities.  McGraw did not get any help doing household chores when she lived by herself.  She said, "Actually, it would be more to the truth is that a lot of things just didn't get done."  R. 77.  She said she did her own laundry, but was exhausted thereafter.  She did her own grocery shopping, but her sons or grandchildren carried the groceries into the house for her.  She went shopping at stores that had scooters available to customers.  R. 77-78.

McGraw said she had "a little bit of a side effect" from her amitriptyline.  She took it to help her sleep and to help with her neuropathy.  She said she did not have side effects from her other medications.  R. 78-79.  She did not describe the side effect.

The ALJ asked McGraw why she could not return to her former coordinator/receptionist—secretary job.  McGraw said it would be hard to work the computer.  She could not use a computer for more than 30 minutes because "I get to the point where I can't see what I'm reading."  She said she spent more than half her time on the computer in her old job.

She said she would also have problems keyboarding for that long. She also said she would have problems putting files in the lower drawers of the file cabinets. She also said she would have pain in her shoulders from lifting and carrying files and supplies. She said she was also on her feet about an hour to an hour and a half during the workday. She said she had to stand for extended periods. She said she could not stand for extended periods now. R. 80-83.

Vocational expert Smith then testified. Smith opined that McGraw's coordinator/receptionist—secretary job fit within the receptionist title in the Department of Labor's Dictionary of Occupational Titles (DOT). The job was sedentary and semi-skilled. R. 85. Smith opined that the DOT receptionist job would generally require lifting 10 pounds occasionally and five pounds frequently, sitting for six hours a day, and standing and/or walking two hours a day. R. 85. The job would require frequent reaching, but much less than occasional overhead reaching. The job would require frequently handling and occasional fingering. R. 85-86. The job would not have any environmental requirements. R. 87.

The ALJ asked Smith about the visual requirements of the receptionist job. Smith testified that the DOT did not address the visual requirements of the DOT receptionist job. Smith opined that a person

would need to be able to read a computer screen.  Smith opined the person would frequently need near visual acuity.  R. 87.

Smith opined that the person would not be able to work if she missed more than two or three days of work per month, or if she was off-task more than 25% of the time.  R. 87.  The hearing then concluded.

The May 12, 2016 Hearing

On May 12, 2016, the ALJ held a second evidentiary hearing.  R. 41-54.  McGraw appeared in person and with her counsel.  Medical expert Dr. Stephen Bowen, M.D., also appeared.  R. 43.

The ALJ called the second hearing to secure expert testimony from Dr. Bowen. Dr. Bowen was board certified in ophthalmology.  R. 43-44; see R. 959-61 (Dr. Bowen's curriculum vitae).  Dr. Bowen reviewed McGraw's medical records.  Based on that review, Dr. Bowen summarized McGraw's ophthalmic records from her medical records.  R. 44-46.  Dr. Bowen opined that McGraw's visual impairments did not meet or equal any impairment listed in the Social Security Administration's Listing of Impairments, 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  R. 46-47.

Dr. Bowen opined that McGraw would have some work-related visual limitations due to her eye impairments:

> There would be some limitation, Your Honor, and that would be probably with depth perception. The individual has very good

left eye vision. The right eye vision is not very good because of the macular changes. So, that individual would have gross stereoscopic depth, but fine depth where putting small objects in holes or putting something in a slit in the screw, or doing very fine work would be very difficult for this person because of the blurring in the right eye. And also, this person has had multiple surgical procedures on the right eye, and so there should be no exposure to toxins or dust or fumes, which could irritate the right eye. All other types of work should be available for this person, solely from the eye standpoint, Your Honor.

R. 47. Dr. Bowen opined that McGraw would not have problems with near vision acuity because her left eye had good visual acuity when she wore her glasses. R. 47. When asked about McGraw's blurred vision in her right eye, Dr. Bowen stated, "[N]ormally, people with a blurred one eye will learn to function pretty adequately if the other eye is really very good, which it is in this case." R. 50. Dr. Bowen stated that he was only opining on McGraw's work related limitations due to her visual impairments. R. 52. The hearing concluded after Dr. Bowen testified.

## THE DECISION OF THE ALJ

The ALJ issued his opinion on June 14, 2016. R. 22-34. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true,

Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in the Listings. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that McGraw met her burden at Steps 1 and 2. She had not worked since her alleged Onset Date of June 1, 2012. She had severe impairments of status post breast cancer; status post shoulder surgery; status post hip surgery; left knee arthritis; diabetes mellitus; neuropathy; obesity; asthma; and vision impairments diagnosed as cataract-left eye, chorioretinal scars-left eye, round hole-right eye, vitreous hemorrhage-right eye, central serous choriorenopathy (CSR)-right eye, retinal hemorrhage-right eye, vitreous syneresis-both eyes, posterior vitreous detachment (PVD)-right eye, and psuedophakia-right eye.[15] R. 24. At Step 3, the ALJ determined that McGraw's impairments or combination of impairments did not meet or equal a Listing. R. 26-27.

At Step 4, the ALJ determined that McGraw had the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant has the following additional limitations: lift, carry, push, or pull 10 pounds occasionally and five pounds frequently; stand and/or walk two hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; and frequently reach, handle, and finger.

---

[15] Vitreous synersis is shrinkage or detachment of the vitreous fluid. <u>See</u> <u>Dorland's</u>, 1855,

The claimant would also need to avoid dust, gases, fumes, poor ventilation, and hazards, such as dangerous machinery or unprotected heights.  She had the ability for frequent near visual acuity but no depth perception.

R. 27-28.  The ALJ determined that McGraw's hip and shoulder surgeries were not debilitating.  The ALJ relied on the fact that McGraw worked for several years after her hip and shoulder surgeries; she also retired in 2010 to take care of her husband, not because she could no longer perform the requirements of her work.  The ALJ found that she could perform sedentary work described by the RFC with these conditions because she did so for years.  The ALJ found that the limitations caused by her cancer treatment were temporary, lasting less than 12 months, and so, did not cause permanent functional limitations.  The ALJ relied on the lack of medical evidence showing that most of her other impairments worsened after the cancer treatment.  The only worsening impairments that affected her functional abilities were neuropathy and her visual impairments.  The neuropathy examinations by Drs. Wagoner and Hanzel showed that she still had sensation in her feet.  See R. 823, 839, 854, 1059.  The medical evidence cited by the parties and the ALJ did not mention any neuropathy in her hands.  The ALJ also relied on her daily activities which showed that she drove daily, did her own housework, did her own laundry, went to church, and visited with friends and family.  The ALJ also relied on Dr.

Kozma's consultative examination and the opinions of Drs. Oh, Nenaber, and Bowen. The ALJ relied on Dr. Bowen's opinions for the finding that McGraw could frequently use her near visual acuity even with her eye impairments. R. 28-33.

At Step 4, the ALJ found that McGraw could perform her prior work as a receptionist as that job was generally performed in the national economy. The ALJ relied on the RFC and the opinions of vocational expert Smith. The ALJ found that McGraw was not disabled at Step 4. R. 33-34.

McGraw appealed. On June 1, 2017, the Appeals Council denied her request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 1. McGraw then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence. The medical evidence shows that McGraw's cancer treatment was less than 12 months and the functional limitations caused by the treatment was also less than 12 months. A person's functional limitations are within the definition of a disability unless the medically determinable impairment must be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 416(i)(1).

The medical evidence also supports the finding that McGraw's limitations due to her hip and shoulder surgeries did not change due to the cancer treatment. She testified that these limitations worsened since 2010, but abundant medical evidence contradicted that testimony. Numerous medical examinations showed that she had full strength. McGraw also was very active, going to see her husband and her aunt daily; going to her own doctors' appointments; taking her granddaughter to her appointments; going to church; doing housework; and visiting with family and friends. All of this evidence together provided substantial evidence that her limitations due to her shoulder and hip surgeries were consistent with the RFC.

The only two permanent impairments that became worse since 2010 were her neuropathy and her eyesight. Substantial evidence supported the ALJ's conclusion that the neuropathy was consistent with the RFC. No medical evidence cited by the parties or the ALJ mentioned neuropathy in her hands. The medical evidence only indicated that she had neuropathy in her feet and toes. Drs. Wagoner and Hanzel found that she still had good sensation in her feet. R. 823, 839, 854, and 1059. This evidence, combined with the other examinations that found a normal gait, normal muscle tone, and normal strength in her extremities provided substantial

evidence to support the ALJ's conclusion that the limitations due to her neuropathy were consistent with sedentary work described in the RFC.

Dr. Bowen provided substantial evidence to support the ALJ's determination in the RFC that McGraw had the ability to use her near visual acuity frequently. Dr. Bowen opined to as much. R. 48, 50. The medical records also consistently showed that McGraw had corrected near visual acuity to 20/20 or almost 20/20 in her left eye.

Vocational expert Smith opined that a person with McGraw's RFC could perform the job of receptionist as it was generally performed in the national economy. This opinion, combined with the RFC finding, provided substantial evidence for the ALJ's determination at Step 4 that McGraw could return to her prior work. The ALJ's decision was supported by substantial evidence.

McGraw argues that the ALJ erred in not addressing all of the impairments listed during her December 10, 2015 office visit with Dr. Phan. The ALJ is not required to address every piece of evidence. He must build a logical bridge from the material evidence to his findings. Clifford, 227 F.3d at 872. Impairments are only material if they affect a claimant's functional abilities to perform work activities. The ALJ identified and addressed McGraw's impairments that affected her functional ability to

perform work activities.  He was not required to talk about all impairments.
There was no error.

McGraw argues that the ALJ erred in relying on Dr. Bowen's
opinions.  She argues that his opinions were inconsistent with the treatment
notes of Dr. Blinder.  The Court disagrees.  Dr. Bowen did not challenge
any of Dr. Blinder's diagnoses, and Dr. Blinder did not opine on McGraw's
ability to use her near vision acuity to perform work activities.  McGraw also
argues that the ALJ cherry-picked Dr. Bowen's opinions.  The Court again
disagrees.  The ALJ fairly stated Dr. Bowen's opinions.  Those opinions
provided substantial evidence for the ALJ's finding that McGraw could
frequently use her near vision acuity to perform work activities.  There was
no error.

McGraw challenges Dr. Bowen's reliance on his experience in
coming to his opinions.  The ALJ is not bound to follow rules of evidence,
such as rules regarding expert opinion evidence, but may be guided by
them.  20 C.F.R. § 498.217(b).  The Social Security regulations, however,
define medical opinions, in relevant part, as "statements from acceptable
medical sources that reflect judgments about the nature and severity of
your impairment(s), including . . . what you can still do despite

impairment(s) . . . ." 20 C.F.R. § 1527(a)(1). Dr. Bowen's opinion regarding McGraw's ability to use her near visual acuity was a medical opinion under this definition. The ALJ, therefore, did not err in accepting Dr. Bowen's opinions.

McGraw argues that the ALJ failed to address her neuropathy in her hands. McGraw's claim that her finger locked up and that she could not use her hands due to neuropathy was not established by objective medical evidence. McGraw did not cite any diagnosis by any acceptable medical source that McGraw had neuropathy in her hands. Dr. Hanzel diagnosed neuropathy in her feet and toes. E.g., R. 823. McGraw cited nothing in the medical records that identified neuropathy in her hands. To the contrary, Dr. Kozma's examination showed no limitations on her ability to use her hands. The ALJ noted that Dr. Kozma's examination indicated McGraw had no difficulty using her hands and fingers for gross and fine manipulations, had good finger dexterity, and had good grip strength. R. 31. The ALJ's findings regarding McGraw's ability to use her hands was supported by substantial evidence.

McGraw argues that the ALJ erred because the combination of her pain, depression, anxiety, migraines, and fatigue rendered her unable to

sustain work on a continuing basis.  The Court disagrees.  The ALJ addressed all of these impairments in his decision.  Substantial evidence supported the ALJ's assessment of the effect on McGraw's ability to perform work activities.  McGraw essentially asks the Court to reweigh this evidence.  This Court will not do so.  See Jens, 347 F.3d at 212.

Finally, McGraw argues that the ALJ erred in finding that she could work because she would need to miss work too often for medical appointments.   The vocational expert Alissa Smith opined that a person with McGraw's age, education, experience, and RFC could not work if she missed more than two to three days per month.  McGraw included a count of her appointments in her Motion.  According to her Count, she had 126 medical appointments and hospitalizations from June 8, 2012, through December 21, 2015, which averaged 3.6 per month.  Brief in Support of Motion for Summary Judgment, at 13-15.  She argues that the ALJ erred in failing to take the frequency of her appointments into consideration in determining that she could work.

The Commissioner notes that many of these appointments were related to her temporary impairments due to cancer treatment which

concluded in April of 2013. The Defendant indicates approximately 50 of the 126 medical appointments were related to cancer treatment. Defendant's Memorandum in Support of Motion for Summary Judgment, at 10. He also argues that frequency of the appointments is not proof that McGraw would have needed to miss an entire day of work for the appointments. Id. at 10. The Court agrees. The sheer number of appointments alone does not establish that she would need to miss work more than two or three days per month. In reviewing the Plaintiff's summary of medical visits, it appears that some medical visits listed are for laboratory blood draws which would take a relatively short period of time.[16] If McGraw had been working after completing the cancer treatments, she could have combined some appointments, scheduled appointments on her days off or during her lunch hour. The frequency of appointments alone does not establish error. The ALJ did not err.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 15) is ALLOWED; Plaintiff Thelma I McGraw's Motion for Summary Judgment titled Brief in Support of Motion

---

[16] For instance, Plaintiff lists four doctor visits in July of 2013. Plaintiff's Brief in Support of Motion for Summary Judgment, at 14, entries 53, 54, 55, and 56. (Entry 56 lists July 26, 2017 as the applicable date, however, the record citation is to a doctor's visit on July 26, 2013. TR. 507) Two of these four appointments or doctor's visits appear to be blood test results. (Entries 54 and 55) A blood draw does not equate to missing a day of work.

for Summary Judgment (d/e 14) is DENIED; and the decision of the

Commissioner is AFFIRMED.  All pending motions are denied as moot.

THIS CASE IS CLOSED.

ENTER:   June 22, 2018

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE